# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------x
                                                 :
                                                 :
UNITED STATES OF AMERICA                         :
                                                 :
                                                 :
           v.                                    :
                                                 :
                                                 :
SAMUEL R. BERGER,                                :
           Defendant                             :
                                                 :
                                                 :
-------------------------------------------------x
```

Docket No. 05-0175M-01

## SENTENCING MEMORANDUM ON BEHALF OF
## SAMUEL R. BERGER

Lanny A. Breuer
David N. Fagan
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000

*Attorneys for Samuel R. Berger*

## TABLE OF CONTENTS

APPENDIX OF EXHIBITS ................................................................................................ ii

I.   Preliminary Statement .......................................................................................... - 1 -

II.  Facts ..................................................................................................................... - 4 -

    1.   *Mr. Berger has led an extraordinary life of devotion and service to his country, community, and family.* ......................................................... - 4 -

    2.   *Mr. Berger's actions at issue, for which he has accepted full responsibility and deeply regrets, were an aberrational departure stemming from unique pressures that he felt to be prepared to answer fully questions related to 9/11.* .......................................................... - 10 -

    3.   *Mr. Berger has cooperated fully with the government.* .......................... - 17 -

III. Sentencing ............................................................................................................ - 17 -

IV.  Conclusion ........................................................................................................... - 19 -

## <u>APPENDIX OF EXHIBITS</u>

Curt Anderson, "Sept. 11 Commissioners Say Berger Missing Document     Exhibit 1
    Probe Didn't Affect Report," Associated Press, July 23, 2004.

Letter from Eli Segal, founding CEO of AmeriCorps     Exhibit 2
    and longtime friend of Mr. Berger

Letter from Anthony Lake, Distinguished Professor, Georgetown University,     Exhibit 3
    and former National Security Advisor

Letter from Fred Reiner, Senior Rabbi, Temple Sinai, Washington, D.C.     Exhibit 4

## I.   **Preliminary Statement**

On April 1, 2005, Samuel R. ("Sandy") Berger pled guilty to a single misdemeanor violation of 18 U.S.C. § 1924(a), removing and retaining without authorization classified documents.   Mr. Berger admitted before Your Honor that he removed from the National Archives and Records Administration ("NARA") and retained in his office a total of five copies of classified documents.   Mr. Berger also admitted that he removed from NARA his own handwritten notes of classified material that he had reviewed there.   These acts occurred in the summer and fall of 2003 in connection with Mr. Berger's review at NARA of Clinton Administration presidential materials responsive to document production requests issued by The National Commission on Terrorist Attacks Upon the United States ("9/11 Commission"). Mr. Berger is scheduled to be sentenced by Your Honor on September 8, 2005.

Mr. Berger has fully accepted responsibility for his conduct.   He voluntarily made a factual proffer to the government, and he also provided a detailed statement acknowledging his wrongdoing to the United States Probation Officer.   In addition, in compliance with the Plea Agreement reached with the Department of Justice, Mr. Berger has continued to cooperate fully and truthfully with the United States, and to provide all information known to him regarding this matter, including through a debriefing by the Inspector General of NARA.   Under the terms of the Plea Agreement, this cooperation further reflects Mr. Berger's acceptance of responsibility for his actions.

As discussed in detail below, Mr. Berger's conduct in this case represented a foolish and aberrational departure from an otherwise extraordinary record of personal achievement and public service to this country.   A devoted husband to his wife of 36 years, supportive father to his three children, selfless friend, and dedicated citizen to his community, Mr. Berger has led a truly exemplary and distinguished life.   Even as he has achieved the highest

professional success and ably performed vast public duties, he has always managed to fulfill family and personal responsibilities and pursue valuable civic work. He has accomplished this fine balance with integrity and probity and in no small part through quiet personal sacrifice, intent to give up his time, to delay his professional ambition, and to sacrifice personal wealth (indeed, whatever has been required of him) in service of a friend, his community, his country.

More than anything, Mr. Berger's personal and professional success derive from two characteristics that define him: an unending drive to get it right, and a sincere dedication to the well-being of others. He brings these two qualities to every endeavor that he undertakes, and so, too, did they contribute to his exercise of reviewing materials at NARA. Mr. Berger spent many hours at NARA reviewing hundreds, if not thousands, of pages of material, designating every document that was potentially relevant for production to the 9/11 Commission. He voluntarily performed this public service under extraordinary time pressures and at daily expense to his personal business. He did so because he felt a responsibility to be able to answer fully all the questions of the 9/11 Commission, to help prepare colleagues to testify before the Commission, and to create as complete and accurate a public record on 9/11 as possible.

Mr. Berger's actions at issue, while misguided and wrong, were borne solely out of these same desires. At no time did Mr. Berger intend to harm the United States or deprive the 9/11 Commission of any material. Indeed, all of the documents at issue were copies, and the Commission has publicly confirmed that it received everything it requested and needed. (Exhibit 1). Nevertheless, Mr. Berger, in removing the materials in question for his own preparation, made a grievous error, and he has accepted the consequences of his actions.

Those consequences have had a profound effect on Mr. Berger and his family. His failure to live up to his own high standards of conduct has embarrassed him. His impeccable

record of public service has undoubtedly suffered, and, for that matter, his ability to perform public service in the area of national security — which is a true passion for him — will be limited for at least three years, unless the government on its own accord determines to restore his clearances before then.   The emotional and financial costs of the entire ordeal have been considerable.  And he and his family have endured a media frenzy that has included stakeouts of their home, false innuendo, and gross mischaracterizations of what actually occurred.

In accepting responsibility for his actions, Mr. Berger has made clear to the Department of Justice, the United States Probation Officer, and NARA that he understands his conduct was wrong and in no way seeks to excuse or justify it — a point that he will also make to Your Honor during sentencing on September 8.  The parties have agreed that the appropriate fine for Mr. Berger's conduct is $10,000, and that, as a consequence of his actions, Mr. Berger will not apply for or seek a United States government security clearance for a period of three years from the entry of the plea, although the government can choose to provide such a security clearance to Mr. Berger at any time.  The government also has agreed not to oppose a request by the defense that Mr. Berger receive a non-custodial sentence.

In submitting this memorandum on Mr. Berger's behalf, we likewise do not seek to minimize the wrongdoing to which he has pled guilty.  Rather, we submit this memorandum to provide context for the Court's consideration of an appropriate sentence and in support of Mr. Berger's request that, in light of all the facts and circumstances, the Court exercise its discretion to impose a non-custodial sentence and apply the penalties that the parties, through the Plea Agreement, have agreed are appropriate.

## II.   **Facts**

### *1.   Mr. Berger has led an extraordinary life of devotion and service to his country, community, and family.*

Born on October 28, 1945, Mr. Berger lived his entire childhood in Millerton, New York, the second child of a merchant and schoolteacher.  From an early age, Mr. Berger demonstrated an appetite and aptitude for leadership, an innate drive for perfection, and a desire to perform public service.  The valedictorian of his high school class, Mr. Berger enrolled in Cornell University in 1963 where he would become President of the Inter-Fraternity Council and a member of Quill and Dagger, an honor society recognizing outstanding leadership and service. He was selected as "Outstanding Member" of the entire graduating class of 1967.  Following graduation, Mr. Berger sought to pursue his commitment to government service by serving as Special Assistant to former New York City Mayor John Lindsay and Legislative Assistant to Congressman Joseph Resnick (N.Y.).  He also joined the United States Army Reserves in 1968, from which he was honorably discharged six years later.

After graduating *cum laude* from Harvard Law School in 1971, Mr. Berger set forth on a distinguished career moving from jobs in government and private law practice.  His first position out of law school was as an assistant to Senator Harold Hughes (Iowa).  In 1972, he joined the staff of Senator George McGovern and served as a speechwriter for Senator McGovern in his presidential campaign that year.  After four years as an associate at Hogan & Hartson — where he would later become partner and head of the International Trade practice area — Mr. Berger returned to the public sector to serve as Deputy Director of the Policy Planning Staff at the Department of State (1977-1980).

It was in his early days of government and political service that Mr. Berger met many of the individuals with whom he would form lifelong friendships, among them Eli Segal,

- 4 -

Tony Lake, and Bill Clinton.  Eli Segal describes the values that formed their early bonds and the

evolution of that relationship into a lifelong friendship:

> A common interest in public service lies at the heart of my friendship with
> Sandy Berger.  We met in the late 60's when we assisted a U.S.
> Congressman.  In subsequent years, we worked together on several
> presidential campaigns, helped numerous policy groups, and served
> together in the Clinton Administration.  In the almost 40 years since we
> first made contact, I doubt that a week has gone by without a
> communication between us on some important public issue of the day.
>
> But to define our relationship in that way understates the extent to which
> our lives are intertwined.  Our wives and our children are extraordinarily
> close, we holiday with the Bergers on a regular basis, I am proud to have
> been Sandy's first client at Hogan and Hartson and Sandy has been there
> for me during all of those moments in life when you just need a friend and
> wise counselor in your corner.

(Exhibit 2).[1]

In 1992, Mr. Berger took a leave from his highly successful private law practice

to serve as a Senior Foreign Policy Advisor to Governor Bill Clinton's presidential campaign and,

then, Assistant Transition Director for National Security as part of the Clinton transition team.

Mr. Berger was named Deputy Assistant to the President for National Security Affairs ("Deputy

National Security Advisor") in January 1993, and was appointed to the position of National

Security Advisor in January 1997, serving until the end of President Clinton's second term.

Thus, for eight years, Mr. Berger served in the most sensitive positions in government at a

unique time in our nation's history — the first full-term post-Cold War presidency.

---

[1] While we could have submitted many more letters to Your Honor on Mr. Berger's behalf,
including from the former President and other statesmen, we have elected to submit the three
attached letters, which are from individuals who represent distinct aspects of Mr. Berger's life
and who eloquently speak to Mr. Berger's commitment to public service, his qualities as a friend,
husband and father, and his dedication to his community.

Such positions naturally impose incredible demands on those who hold them, and Mr. Berger was no exception. He worked days and nights — in fact, he became legendary around the White House for his stamina and the amount of work that he generated — to effect U.S. interests abroad, improve the well-being of other nations, and protect our nation against threats to our security. He performed this work admirably, contributing to successes that positively affected the lives of millions of people. These included helping to formulate and prosecute humanitarian interventions (e.g., Haiti, Bosnia, Kosovo), designing and pursuing strategic engagements relationships with historic rivals (e.g., engagement with Russian and China), liberalizing and expanding trade throughout the world, pursuing the NATO engagement in Kosovo and fostering a peaceful regime change in the former Yugoslavia, and driving negotiations for peaces in troubled regions (e.g., Northern Ireland, Middle East). There always will be debate about individual initiatives undertaken by any Administration, but one thing is unequivocally clear about Mr. Berger's record: in every issue that he pursued over the course of these eight years — indeed, in all that he has pursued both in his public and private capacities — Mr. Berger earned the trust of those closest to him through his unceasing integrity and honesty and commitment to doing the job the right way.

Tony Lake, Mr. Berger's former boss at the Policy Planning Staff and again in the White House, speaks to these qualities:

> I have known Sandy very well for some thirty years . . . . I have known him, always, as a man of extraordinary integrity.
>
> As my Deputy, and then as National Security Advisor, Sandy was notable -- and widely noted -- for his exemplary ability to bring before the President the views of his colleagues fairly and openly. He did not play games in his role as "honest broker."
>
> While advising political candidates over the years, Sandy was most certainly doing so from a partisan perspective. But I have often been

- 6 -

struck by how he proceeded from, and was bound by, an honest assessment of the substance of the issues.

And, in many personal dealings with Sandy over the years, I have never known him to be anything but honest and candid. I would trust him, and have trusted him, with anything and everything.

(Exhibit 3).

Eli Segal adds: "Sandy Berger is the ultimate workhorse. Whether building a dollhouse for each of his daughters, doing legal work for a client, or representing the interests of his country, Sandy's approach is simple and consistent: get it right, without regard to whether he derives any personal benefit from the effort." (Exhibit 2).

Beyond his well-known professional record, Mr. Berger has applied the very qualities of which Tony Lake and Eli Segal speak so highly — his reputation for honesty and integrity and his commitment to doing things the right way — in pursuit of important civic work. For example, for the last three years, he has served as senior counselor to the International Commission on Holocaust Era Insurance Claims (ICHEIC), crafting the criteria for, and assisting in, the evaluation of claims made by thousands of Holocaust survivors and their heirs to insurance policies from the Holocaust period. In this capacity, Mr. Berger has assisted in the award of more than $26 million to Holocaust victims and their descendants. He also has been an active member of his synagogue, serving as trustee and officer and chairing a capital contribution campaign even while he was heavily involved in the presidential campaign of 1992. Rabbi Fred Reiner, chief rabbi of Mr. Berger's congregation, Temple Sinai, in Washington, D.C., says:

Sandy has been extraordinarily generous with his time and expertise in co-chairing our capital campaign, staff evaluations, and providing thoughtful and wise counsel on many occasions. Often we have turned to him for difficult assignments in the congregation, and he has responded with dedication and commitment . . . .

While we have had many members who have made significant contributions to our national life, Sandy Berger really stands alone as an

individual who has also made an enormous difference in the life [of] our congregation and religious community.

(Exhibit 4).

These examples do not even begin to recount the many hundreds of pro bono hours Mr. Berger contributed while in private law practice. These included service on the Board of Directors of the International Human Rights Law Group, pro bono assistance to the new Solidarity government in Poland after the fall of communism, and pro bono representation for three years of an indigent client under the Criminal Justice Act.

But perhaps what most defines Mr. Berger's generous spirit are the many works that he has done quietly to improve the lives of friends, colleagues, and neighbors — deeds that no one would ever know about but for the testimony of those closest to him. Eli Segal speaks of Mr. Berger's "unique commitment to others":

> Sandy is completely selfless in the service of people regardless of rank.
>
> It would be easy to address this attribute by appeal to the extensive public records. That record, however, would not include the hours he spent sitting with a dying friend at the same time he was serving as Deputy National Security Advisor, or the time he gave to complete the capital campaign that he led at his synagogue while fulfilling his public responsibilities, or the financial sacrifice he made when he purchased a home for a beloved, but nearly destitute, former teacher. The public record might, but probably doesn't, reflect his recommendation to President Clinton who wanted Sandy as his first National Security Advisor that someone else should have the appointment because he believed him to be better qualified.

(Exhibit 2).

Mr. Berger's commitment to matters about which he cares deeply also is evident in the personal and professional interests that he has pursued since leaving government office. In the spring of 2001, Mr. Berger founded Stonebridge International LLC, a global business strategy consulting firm. In four years, he and his partners have built the company to include

- 8 -

more than two dozen clients with offices in Washington, D.C. and abroad.  Through Stonebridge and as a frequent public speaker, Mr. Berger has continued to serve as one of the brightest American foreign policy minds, helping to drive thinking and debate over issues such as how best to prosecute the war on terrorism, the potential for and obstacles to peace in the Middle East, and our strategic relationship with China.  He is frequently called upon to testify on foreign policy issues before the Congress.

While Mr. Berger takes pride in the assistance that he has provided to his country, friends, community members, and clients over the years, nothing provides more joy or has received more attention than his family.  Married for 36 years, he and his wife, Susan, are true partners in all of life's successes and travails.  Their three children — Deborah, 32; Sarah, 28; and Alexander, 25 — have entered disparate, successful careers, and are making important contributions in the fields of media, law, and entertainment.  In each of their lives, Mr. Berger has been the consummate dad, from coaching his son's baseball team for five years, building by hand elaborate dollhouses for his daughters (one took him two years to complete), tending to and nurturing their various interests, helping with their homework, and forming a monthly parent-children book club in their youth, to being their confidant, friend, and source of emotional support from their early adulthood to today.  No matter the heights of his professional success or the extent of his public and other commitments, Mr. Berger has always had time to give first to his family.  Rabbi Reiner speaks to this commitment:

> I have had the privilege of officiating at several life cycle services and ceremonies with Sandy's family and know them well.  I know him as a caring husband and dedicated father.  I have witnessed his support for his family in the face of enormous professional and public service pressures. I have seen his dedication to our religious schools, where his children were educated, and to special programs that were important to his family.
>
> (Exhibit 4).

American poet Ella Wheeler Wilcox wrote that "fortune smiles on those who work and wait." That is certainly true of Sandy Berger. Mr. Berger has had the good fortune to be a successful husband, father, citizen, attorney, and public servant, and to be admired and loved by his family, friends, and colleagues. He has had such fortune because, as his friend Eli Segal writes, he is "a good man in the best sense of that term -- a man where good intentions have met good deeds over a lifetime." (Exhibit 2).

2.   *Mr. Berger's actions at issue, for which he has accepted full responsibility and deeply regrets, were an aberrational departure stemming from unique pressures that he felt to be prepared to answer fully questions related to 9/11.*

Those who know Mr. Berger well and are familiar with his life's work fairly ask how he came to take the actions at issue in reviewing documents at NARA. The answer starts with the terrorist attacks of September 11. The events of that day almost certainly touched every American, evoking a unique reaction in each one of us. For Mr. Berger, the outrage and sorrow over the tragedy were compounded both by the fact that he had been responsible for coordinating the response to terrorism issue while at the White House and because he immediately was deluged by questions from the press. These produced what, in retrospect, was a predictable response on his part — to become immersed in an effort to compile an accurate record of the Clinton Administration's activities regarding terrorism in the 1990s. This also meant striving to fulfill what he believed to be an obligation, as former National Security Advisor, to assist first the Joint Congressional Intelligence Committee review of 9/11 and later the review of the 9/11 Commission and to prepare his former colleagues to answer the various 9/11-related inquiries accurately. Unfortunately, and inexcusably, Mr. Berger's intense focus on these objectives, combined with the stress of the document review, produced a lapse in judgment at NARA that

resulted in the actions at issue. The record is clear, however, that those actions, while misguided, were taken entirely for his own preparation, and not for any other reason.

Following the attacks of September 11, Mr. Berger, like many of his former senior colleagues in the Clinton Administration, faced continuing press inquiries regarding what the Clinton Administration knew about Al-Qa'ida, and what the Administration did to address a range of issues related to it (e.g., terrorist financing, efforts to capture Bin Laden, policies toward Afghanistan and the Taliban, homeland security). For Mr. Berger, facing such intense interest and demands without the staff, organization and resources of his former office was an unfamiliar challenge. It also required a delicate touch — while many of the inquiries from the press, Congress, and others were legitimate, some were politically motivated, even in the short weeks after 9/11. Thus, Mr. Berger confronted a duty to respond to the legitimate questions and contribute to the overall education of the public, while also refuting, with facts, those critiques that were specious. Despite the lack of resources and having a new business to run, Mr. Berger, uniquely among his colleagues, assumed the leadership role in responding to these inquiries.

In particular, to respond to the questions relating to 9/11, Mr. Berger led an effort to reconstruct the entire Clinton record on terrorism. This proved a monumental undertaking for a variety of reasons. First, terrorism was just one of many issues (e.g., Iraq, the Balkans, the Middle East Peace Process, Russia, China, India-Pakistan, nonproliferation) that Mr. Berger and his colleagues dealt with over the course of eight years. Second, the issue of "terrorism" was complex, touching on many agencies and activities (e.g., tracking and seeking to find Al-Qa'ida operatives, blocking their finances, gathering intelligence and countering specific new threats, encouraging our allies and others to combat terrorism, protecting American assets at home and abroad). Third, in turn, no one person had all the details, and the numerous people who had dealt

with the various aspects of the "terrorism" issue were scattered all over the world.  Fourth, there was a constant stream of new questions that Mr. Berger felt a responsibility to answer accurately.  As a result, from 2001-2003, Mr. Berger spent hundred of hours on 9/11-related work and recreating the Clinton Administration record on terrorism, resulting in the production of literally volumes of materials addressing every aspect of the terrorism issue.  (And, not surprisingly, this work paid off — a senior staffer for the Joint Congressional Inquiry into 9/11 remarked that Mr. Berger was the most helpful witness they interviewed.)

In the course of this work, Mr. Berger was designated to review Clinton Administration presidential materials at NARA, and later, in June 2003, was asked to review materials at NARA in response to document production requests from the 9/11 Commission.  The purpose of this review was to approve the responsiveness of materials to the 9/11 Commission and to determine whether any materials should be exempted from the production on the basis of executive privilege.   Mr. Berger, with the approval of the former President, determined to produce all potentially relevant materials and not to assert executive privilege over any document, even though many of the documents he reviewed fell within the clear boundaries of the privilege.

The document reviews turned out to be a protracted process, involving very long days that required Mr. Berger to be at the National Archives for eight to ten hours at a time.  The reviews also were tiring, requiring Mr. Berger to review hundreds, if not thousands, of pages of materials on each occasion.  Such an undertaking would have been a burden for a younger person, whose time was more his or her own and who perhaps would have been more accustomed to long document reviews.  It was an extraordinary task for the former National Security Advisor.

The onerous nature of the reviews was particularly important because, in addition to reviewing and producing materials responsive to the 9/11 Commission, Mr. Berger viewed his visits to NARA as an opportunity to effect an important secondary purpose — namely, to use the document review to re-familiarize himself with the historical record dating back five years.  In Mr. Berger's mind, such a re-familiarization was important to create a more complete record of the Clinton Administration's actions as they related to 9/11 and, in turn, be better prepared to testify before the 9/11 Commission and to prepare other Clinton Administration officials to testify as well.  Ultimately, each of these factors in combination — the tiring nature of the review, the burden it imposed on Mr. Berger's schedule, and the importance that Mr. Berger attached to being prepared to testify before the 9/11 Commission and to prepare his colleagues — led Mr. Berger, acting wholly out of character, to take the actions summarized in the Factual Proffer read to Your Honor on April 1.

Specifically, during the course of his document review on September 2, 2003, Mr. Berger encountered a memorandum entitled the "Millennium After-Action Report" ("MAAR"), a self-critical assessment that Mr. Berger had asked Richard Clarke, the coordinator of the Counterterrorism Security Group of the National Security Council, to prepare in early 2000 after the United States had successfully averted planned Al-Qa'ida attacks over the millennium.  Mr. Berger believed that the report would be of keen interest to the 9/11 Commission because it (i) reviewed vulnerabilities that had been manifest as a result of the Millennium exercise, (ii) concluded with a prescriptive section on measures to improve homeland security against terrorist threats, and (iii) already had received considerable public attention, including being mentioned in the New York Times and discussed in an article in The New Yorker.  The report, however, was longer than many other documents that needed to be

reviewed, and there were many recommendations. Mr. Berger was certain that he would not be able to remember every point, and, at the time he came across the document, he was daunted by the prospect of trying to complete the document review that day, which he hoped would be the last time he would need to review materials at NARA. Accordingly, rather than ask to see the document at a later date, Mr. Berger, in what he fully acknowledges was a terrible decision, took the document when he left the Archives on September 2.

Notwithstanding his sincere hope to have concluded the review at the Archives in September, Mr. Berger was required to return on October 2 to review additional documents. During this review, he encountered additional draft versions of the MAAR, which did not appear to be identical (e.g., one had a different classification than the others). This raised a question in Mr. Berger's mind about whether there had been meaningful changes during its drafting process and, in turn, produced conflicting instincts: On the one hand, Mr. Berger wanted to be able to study the different versions so that he could be prepared to answer questions if there had been meaningful changes; on the other hand, he desperately wanted to complete the document review that day so that he would not have to return to NARA. Deciding that he could not reasonably take the time to compare the documents and still complete the document review that day, Mr. Berger repeated his unwise decision from September and determined to take the versions of the MAAR back with him to his office at the end of the day.

Importantly, none of the documents that Mr. Berger took were ever revealed to anyone outside of the Archives, nor, for that matter, did Mr. Berger ever discuss the fact that he had the documents. Mr. Berger compared the October 2 documents at his office later that night, and, after determining that there did not appear to be any substantial differences among them, cut up three and disposed of them to prevent anyone else from reading them. He kept a fourth to

compare to the September version at a later, less exhausted time.  These were the two documents (the September version and one copy from the October review) that he returned a few days later to the Archives.

Furthermore, at no time did Mr. Berger believe that, by taking the document on September 2 or the additional versions on October 2, he would be depriving the 9/11 Commission of important material.  Indeed, he assumed the opposite — namely, that the Commission would know about and have access to the MAAR from multiple sources and would ask questions about the document and its recommendations.  It was apparent to Mr. Berger when he was reviewing the MAAR documents that they were copies, not originals.  Mr. Berger also was aware that the report had been circulated widely through the inter-agency review process on multiple occasions while it was being prepared and considered.  It therefore was inconceivable to him that other copies would not exist in other agencies, which copies the 9/11 Commission would be able to access.  Moreover, as mentioned, the existence of the MAAR had been prominently discussed in public materials, leading Mr. Berger to conclude that the Commission staff would independently know of it.  And, as the 9/11 Commission itself later confirmed and the Factual Proffer makes clear, the Commission in fact did receive all the documents that it requested and needed.

The Factual Proffer also refers to notes that Mr. Berger took with him from the Archives.  Mr. Berger realized during his first review on July 18 that the documents were not ordered chronologically, by subject matter, or in any other way that would enable him to retain information.  Specifically, the documents appeared to Mr. Berger as though they had simply been lifted from various National Security Council files, with the result being that they randomly jumped among topics — for example, one document would relate to efforts in Afghanistan in

1999, while the next document might deal more broadly with terrorist financing in Saudi Arabia and Iran in 2000. This presentation of materials made it difficult for Mr. Berger to fill in gaps in his own record of the Administration's actions and, in turn, prepare to testify before the 9/11 Commission.

Unable to piece together the information that he was reviewing in a logical manner, Mr. Berger decided to take his notes on the documents from the Archives. To be clear, Mr. Berger was permitted to take notes on a notepad while reviewing the documents, and he could have submitted the notes that he wanted to take with him for a classification review, with certain of the notes presumably being produced to him at a later date. However, weary from the document review and not thinking clearly, Mr. Berger failed to follow the proper protocols and simply took many of the notes from the notepad for the purpose of later putting their contents into chronological order to assist in his preparation for the 9/11 Commission. Having taken the notes in July without anyone from NARA saying anything to him about it, Mr. Berger likewise took notes with him following his two later visits, on September 2 and October 2, 2003. None of these notes, however, were ever incorporated into any materials outside of NARA, and Mr. Berger voluntarily returned all the notes when contacted by NARA in October 2003, notwithstanding that NARA officials did not ask about the notes at the time.

Mr. Berger has accepted responsibility for all of his actions. He admits that he made a mistake in acting for his own expediency, and then in not initially telling Archives officials what had happened because he was embarrassed by his conduct. He also has repeatedly acknowledged that no extenuating factor — not the public service that he sought to perform in conducting the review, the extraordinary nature of the documents reviews and the stress that he felt while performing them, his voluntary return of all the notes, or the facts that the documents

at issue were copies, the Commission received all the relevant materials, and no one else saw the documents — excuses his lapse in judgment. But the context of Mr. Berger's review does make clear that he had no ill intent and that his actions, while not justifiable, also did not harm anyone. Indeed, at the end of the day, the only damage that Mr. Berger inflicted was to himself. He has accepted those consequences, and looks forward to putting this entire episode behind him so that he can continue his private and public service to his clients, community, and country.

### 3.   *Mr. Berger has cooperated fully with the government.*

Mr. Berger has fulfilled his commitment under the Plea Agreement to cooperate fully and truthfully with the government, and to provide all relevant information known to him. Through counsel, Mr. Berger first advised NARA and, later, the Department of Justice that he wished to cooperate completely with their investigations and was readily available to answer any questions. Prior to entering the Plea Agreement, Mr. Berger provided a complete debriefing to the government, and he voluntarily met with and answered additional questions from the Inspector General of NARA this past July. While such cooperation was mandated under the Plea Agreement, Mr. Berger also views it as his duty to help remedy his actions, and he has and will continue to remain available to answer questions from the Department of Justice or NARA and to assist the Inspector General in any way that he can.

## III.   Sentencing

The parties agree, and the United States Probation Office concurs, that the appropriate Guideline for the offense at issue is U.S.S.G. § 2X5.1, and because there is no analogous Guideline, the provisions of 18 U.S.C. § 3553(b) shall control Mr. Berger's sentencing. Under the Plea Agreement, the parties also have agreed that the appropriate fine for Mr. Berger's offense is $10,000, and that Mr. Berger will not apply for or seek a United States government security clearance for a period of three years from the entry of the plea, although the government

- 17 -

can choose to provide such a security clearance to Mr. Berger at any time.  The government also does not oppose our request that Mr. Berger receive a non-custodial sentence.

We respectfully submit that these terms are appropriate to serve the interests of justice.  As the foregoing factual discussion makes clear, Mr. Berger has served his country with distinction and has been a pillar of his community.  His devotion to civic and public work is surpassed only by his loyalty to his friends and his commitment to his family.  He is respected in both public and private life as a man of the utmost integrity and highest character.  The actions at issue were an anomalous and embarrassing departure from an otherwise impeccable public record.  They also were taken during the course of an unusual public service and with the intent of fulfilling a public duty to assist in the inquiry into the greatest tragedy this country has ever known.  Nonetheless, Mr. Berger has fully acknowledged his wrongdoing and expressed his sincere regret.  He also has cooperated in the government's investigation.  There can be no doubt that, should Mr. Berger have occasion to handle classified information again, there will be absolutely no risk of recurrence.

In light of these factors, and given the misdemeanor nature of the offense, we believe that a fine of $10,000 — in addition to the three-year restriction on Mr. Berger's classified clearance imposed under the Plea Agreement — is an entirely appropriate and sufficient sentence.

IV.     **Conclusion**

        For the foregoing reasons, we respectfully request that the Court exercise its

discretion to impose a non-custodial sentence that reflects the terms of the Plea Agreement.


Dated: Washington, D.C.
        September 2, 2005


                                        Respectfully submitted,


                                By: _____
                                        Lanny A. Breuer
                                        David N. Fagan

                                        Covington & Burling
                                        1201 Pennsylvania Avenue, N.W.
                                        Washington, D.C.  20004
                                        (202) 662-6000

                                        *Attorneys for Samuel R. Berger*